The FIRST NATIONAL BANK OF WICHITA FALLS et al., Appellants,

v.

The FIRST BANK OF CHICO, Texas, et al., Appellees.

No. 15654.

Court of Civil Appeals of Texas.

Fort Worth.

Dec. 9, 1955.

Rehearing Denied Jan. 6, 1956.

Rogers & Eggers and Guy Rogers, Wichita Falls, for appellants.

C. T. Gettys and H. G. Woodruff, Decatur, for appellees.

BOYD, Justice.

Appellee, The First Bank of Chico, Texas, a private bank owned by R. Lee Morris, filed this suit against J. S. Neville for debt and for foreclosure of chattel mortgage liens on cattle, and against appellant, The First National Bank of Wichita Falls, for a decree establishing the Chico Bank's mortgages as superior liens on the cattle. The Wichita Bank answered, claiming prior liens on the cattle, and prayed for such adjudication and for judgment against Neville for debt and foreclosure of its liens. Trial was to the court, and judgment was rendered for the Chico Bank against Neville for $83,239.56, against the Wichita Bank and Neville for $11,694.01, and against Howell E. Smith, trustee, for $8,952.32. Judgment was rendered for the Wichita Bank against Neville for $55,836.23. The Wichita Bank and the trustee have appealed.

All the cattle in controversy had been sold before the suit was filed. The dispute between the Banks was as to priority of liens, and adjustment of pasturage and feed charges.

There were 406 cattle involved in the suit. Both Banks claimed superior liens. The court found that the Chico Bank had superior liens on 168 of the cattle, and that the Wichita Bank had superior liens on 238 of the cattle.

The Wichita Bank had furnished Neville money with which to buy cattle for approximately twenty years. When the cattle were bought, Neville would usually pay for them with a draft on the Wichita Bank, and would promptly go to the Bank and make a note for the amount. In every instance, the Wichita Bank took a mortgage on the cattle so purchased and forthwith filed them for registration in the counties where the cattle were located. Each mortgage contained the following provisions: "Also all other cattle, sheep, hogs, horses and other livestock situated in said County aforesaid now owned, or that may be hereafter acquired, by said mortgagor, until this mortgage is released in full, save and except such livestock as may be herein especially reserved * * * and as well to secure the payment of all other indebtedness now owing said bank, and any and all indebtedness hereafter to become owing said bank, its successors, assigns or legal representatives, whether evidenced by note, overdraft, or otherwise, * * *." None of said mortgages has been released.

The cattle on which the Chico Bank claims the superior lien are not described in any mortgage given to the Wichita Bank. They were bought by Neville on March 2, 1951, in payment for which he drew a draft on the Chico Bank pursuant to an agreement with that Bank that the Bank would furnish the money for the purchase of cattle, and that title to the cattle would be in said Bank until they were paid for by Neville. On March 6, 1951, the draft was received and paid by the Chico Bank and charged to Neville's account as an overdraft. On March 12, 1951, Neville executed his note for the amount of his overdraft and executed a mortgage on the cattle to the Chico Bank. The note and mortgage were dated March 1, 1951. The mortgage was not registered until November 3, 1952. The Wichita

Bank had no knowledge of the existence of that mortgage until the late summer or early fall of 1952. In addition to the Wichita Bank's claim that its several mortgages theretofore given by Neville covered future acquired cattle, it took from Neville two mortgages after the Chico Bank's mortgage was executed, but before it was registered and before the Wichita Bank had any knowledge of its existence. One of such mortgages was dated June 15, 1951, and the other July 19, 1951. Neither of those mortgages described the cattle on which the Chico Bank claims the prior lien, but both particularly described other cattle located on the Morris ranch in Clay County, and both purport to cover and include "all other cattle, * * * that may be hereafter acquired, by said mortgagor."

In the fall of 1952, after each Bank learned for the first time that Neville was dealing with the other, and when a controversy had arisen between them as to priority of liens, it was agreed by the Banks and Neville that on account of the depressed condition of the market, the cattle then owned by Neville on which each Bank claimed to have superior liens should not be sold but should be carried through the winter. At that time Neville had a lease on the Chico Bank's 3,800-acre ranch in Clay County, at an annual rental of $10,000. It was agreed that the Chico Bank would furnish its ranch upon which to graze the cattle, at a monthly rental of $833.33, that the Wichita Bank would furnish the feed, and that Neville would feed and take care of the cattle. Whenever the cattle were sold, the pasturage and feed bills were to be paid out of the proceeds ratably as the priorities of liens should be determined. There is a controversy as to whether the pasture was to be furnished and the monthly rental paid only through the winter of 1952–53, or whether this arrangement was to last until the cattle were sold. Without Morris' knowledge or consent, on April 1, 1953, Neville moved the cattle off of the ranch and to the State of Kansas. Different lots of the cattle were sold at different times during the summer of 1953, the last sale being on September 30, 1953. The net

proceeds were remitted by Neville to the Wichita Bank, except $8,952.32, which was received for the last 89 cattle sold, and which it was agreed should be held by Howell E. Smith, trustee, until the priority of liens was determined.

A mortgage may be valid upon after-acquired property. Childress v. First State Bank of Barnhart, Tex.Civ.App., 264 S.W. 350; Lawson v. First Nat. Bank of Rotan, Tex.Civ.App., 150 S.W.2d 279; Fort Worth Nat. Bank v. Red River Nat. Bank, 84 Tex. 369, 19 S.W. 517; Lapowski v. Taylor, 13 Tex.Civ.App. 624, 35 S.W. 934. A mortgage will secure later advances. Cattle Raisers' Loan Co. v. First Nat. Bank of Decatur, Tex.Civ.App., 54 S.W.2d 857, and authorities there cited. But we think that although a mortgage may be valid upon after-acquired property, it does not cover any greater interest in the property than the mortgagor acquires. Hamilton Nat. Bank v. Harris, Tex.Civ. App., 260 S.W. 318; 5 R.C.L., p. 403, sec. 27; Hammel v. First Nat. Bank of Hancock, 129 Mich. 176, 88 N.W. 397, 95 Am. St.Rep. 431; Thurmond v. International Harvester Co., Tex.Civ.App., 166 S.W.2d 742; Tips v. Gay, Tex.Civ.App., 146 S.W. 306.

"A mortgage given to cover after-acquired property covers such property only in the condition in which it comes into the hands of the mortgagor. If that property is already subject to mortgages or other liens at that time, the general mortgage does not displace them although they may be junior to it in point of time. It attaches only to such interest as the mortgagor acquires. If he purchases property and gives a mortgage for the purchase money, the bill of sale which he receives and the mortgage which he gives are regarded as one transaction, and the prior mortgage cannot displace such mortgage for the purchase money. In such cases, the first mortgagee does not hold the position of a purchaser or third person within the meaning of the recording acts and is not such a creditor as is protected by them, and a failure to register a mortgage given for the purchase price of the after-acquired property makes no difference. * * *" 10 Am.Jur., p. 851, sec. 205.

The cattle on which the court found the Chico Bank's lien to be superior were bought by Neville in Oklahoma and shipped to the Morris ranch in Clay County, Texas. We agree with the Wichita Bank that when these cattle reached Clay County they were not mortgaged, but we think they belonged to the Chico Bank at that time, and that title to them did not vest in Neville until he executed the note and mortgage dated March 1, 1951. The point that it was error to decree that the Chico Bank had the superior lien on the 168 cattle is overruled.

The Wichita Bank's second point is that the court erred in rendering a money judgment against it and in favor of the Chico Bank for part of the proceeds of the sale of the cattle, because it says a mortgage lien does not attach to such proceeds, the mortgagee's remedy being to follow the property into the hands of the purchaser or to waive the lien and sue the purchaser for conversion. This may be sound as a general proposition, but we think it has no application here. When Neville sold the cattle in Kansas, he remitted most of the proceeds to the Wichita Bank, and that Bank immediately converted such proceeds into a cashier's check payable to itself and held it, in accordance with the agreement of the parties, until the priorities could be determined. The judgment in favor of the Chico Bank against the Wichita Bank for $11,694.01 was for the balance due the Chico Bank for the cattle on which it was found to hold the superior lien, together with the amount found by the court to be due from the Wichita Bank to the Chico Bank on the pasturage and feed bill adjustment. This point is overruled.

Nor do we perceive any error in the holding that the fund in the hands of the trustee belonged to the Chico Bank. This was the net proceeds from the sale of the last 89 cattle. It is true, as the Wichita

Bank says, that the cattle had been commingled, and there may be room for doubt as to whether the Chico Bank's mortgage covered all of said cattle, although we think the evidence supports the court's finding that it did. But there is no complaint that the cattle should have been weighed separately and the sales price computed on each head of cattle. Having found that the Chico Bank had the superior lien on 168 of the 406 cattle, the court was only awarding that Bank judgment for $\frac{168}{406}$ths of the total sales price. The only part of that finding complained of, as we understand the Wichita Bank's position, is that the Chico Bank did not have the superior lien on any of the 406 cattle; but if it did have a superior lien on the 168, as found by the court, the court should have awarded to the Chico Bank $\frac{168}{406}$ths of the amount in the hands of the trustee. Had it been done that way, the court would have been compelled to award a greater recovery against the Wichita Bank than was awarded in order to give the Chico Bank $\frac{168}{406}$ths of the total sales price. By either method of computation the result would be the same.

The Wichita Bank assigns as error the finding that it was agreed that the Chico Bank would be paid for pasturage for the cattle "until same were finally sold," and that the rental was due until September 30, 1953. We do not think there was any evidence of probative force to support the finding. Morris testified that Neville did not want to sell the cattle, but wanted to "'carry them to grass.'" He further testified:

"Q. * * * Now, in the fall of 1952, did you and Mr. McGregor and Mr. Neville have a conference about what to do with these cattle? A. Yes, I thought so through the winter.

"Q. Yes. A. Only. * * *

"A. And I did agree to aid them and co-operate with them through the winter— * * *

"A. —on certain terms of feeding. * *

"A. We were carrying them through the winter. * * *

"Q. Now, this conversation that you had with Mr. Carter and Mr. Miller of The First National Bank of Wichita Falls about handling the cattle through the winter of 1952–53—A. Not '53.

"Q. The winter of '52–'53? A. Yes. That's right. Early. * * *

"Q. Mr. Morris, do you recall any conversation with The First National Bank of Wichita Falls with reference to feeding and pasturing the cattle here in question through the winter of '52–'53? A. Yes."

Morris did testify that it was his understanding that he was to furnish the ranch at that figure until the cattle were disposed of.

On November 21, 1952, the Wichita Bank wrote the Chico Bank in part as follows: "In our recent conversation with you, it has developed that this bank and yourself both claim certain liens on cattle or a part thereof belonging to J. S. Neville, of Archer City, Texas. The cattle at the present time in controversy are located on your ranch in Clay County, Texas. Both of us have agreed with Mr. Neville that this would not be the proper time to dispose of the cattle on account of the depressed market conditions. Mr. Neville has agreed to feed the cattle, and we will pay for the feed. It is our understanding that you also agree to furnish the pasturage for the cattle. When the cattle on the ranch are sold, we will be repaid the funds expended for the feed, and you will be paid $833.33 per month for pasturage from and after November 1, 1952. The balance of the sale price will be ratably distributed between us as our interest may appear." Morris testified that he thought the letter set out the agreement. Neville took the cattle to Kansas "to grass" on April 1, 1953.

We think that under the agreement the Chico Bank is to be paid the ranch rentals for the period from November 1, 1952, to April 1, 1953, in the total amount of

$4,166.65, $238\%_{406}$ths of which amount, or $2,442.52, is chargeable to the Wichita Bank.

We agree with the Wichita Bank that the part of the judgment prorating the feed costs should be revised. The court found that the Wichita Bank expended $16,435.-08 for feed. In addition to furnishing the feed for the 406 cattle involved in the suit, there was included in the above amount feed for 142 yearlings on which the Chico Bank claimed no lien. In prorating the feed cost, the court computed the same amount of feed per head for the yearlings as for the cattle in controversy, which were mature steers. The only testimony on the question as to whether the yearlings consumed as much feed per head as the steers was that of the witness Miller, who testified that he had been familiar with the cattle business for many years, and that he and Neville, who was an experienced cattle man, estimated that the yearlings each consumed $6.62 less in feed than the other cattle. There being no other evidence on the point, we think the implied finding that it cost as much per head to feed the yearlings as it did to feed the other cattle is without support, and that the only basis for computation is the estimate to which Miller testified as being the opinion of himself and Neville. We therefore think the amount of the feed bill chargeable to the Wichita Bank should be $3,562.96 for the yearlings, and $238\%_{406}$ths of the remaining $12,872.12, or $7,545.73, and that the Chico Bank is chargeable with $168\%_{406}$ths of $12,-872.12, or $5,326.39.

The judgment is accordingly reformed so as to award recovery for appellee. The First Bank of Chico, Texas, against appellant, The First National Bank of Wichita Falls, in the sum of $8,834.78, instead of the sum of $11,694.01, and, as reformed, the judgment is affirmed. The costs of the appeal are adjudged one-half against appellant, The First National Bank of Wichita Falls, and one-half against appellee, The First Bank of Chico, Texas.